## QUAKER STATE CORPORATION

v.

## UNITED STATES COAST GUARD; Admiral Paul A. Yost, Jr., Commandant, United States Coast Guard.

### Civ. A. No. 87–55 Erie.

United States District Court, W.D. Pennsylvania.

March 7, 1988.

Kenneth Kilbert, Dean Calland, Pittsburgh, Pa., for plaintiff.

Robert L. Hines, Ellen M. Mahan, Attys., Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Craig R. McKay, Asst. U.S. Atty., Erie, Pa., James Augustine, Staff Atty., Claims and Litigation Div., U.S. Coast Guard, Washington, D.C., for defendant.

## FINDINGS AND OPINION

GERALD J. WEBER, District Judge.

On July, 2 1985, the Coast Guard and Environmental Protection Agency (EPA) observed a sheen on the surface of the water on Pine Run in McKean County, PA. Nearby they discovered an abandoned and refilled waste water containment pit with evidence of petroleum residues. Over the following year the Government executed a cleanup operation which entailed the excavation and removal of 115 truckloads of material. The cost of the operation totalled $430,000.00 and the Coast Guard demanded payment of those costs, plus interest and penalties, from Quaker State.

Quaker State filed this declaratory judgment action seeking to determine the single discrete issue of whether it was an "owner or operator" of the site within the meaning of the Clean Water Act, 33 U.S.C. § 1321(f), as charged by the Government. The Coast Guard asserted a counterclaim, seeking to establish strict liability under § 1321(f). Subsequently, the Government sought leave to amend its counterclaim to assert an alternative basis for liability under § 1321(g).

We scheduled trial solely for a determination of whether Quaker State was an "owner or operator" within the meaning of the Act. Quaker State then filed a motion for summary judgment arguing that the Act by its terms defined "owner or operator" as of the time of *discovery* of the spill. Because Quaker State's lease expired in 1975 and operations ceased in 1978, Quaker State contends it could not be an "owner or operator" in 1985 when the spill was discovered.

On the other hand, the Government contends that "owner or operator" is defined as of the date of initial discharge. It argues that the date of discovery, even if years after the discharge, is irrelevant. In this case the government contends that the initial discharge occurred in 1977 or 1978 while Quaker State was still engaged in operations on the site.

Therefore, for the Government to prevail on the strict liability claim under § 1321(f) we must accept the Government's interpretation of "owner or operator", and we must conclude that the initial discharge occurred while Quaker State was still on site. If we reject either premise, then Quaker State is not strictly liable under § 1321(f), though it may ultimately be liable on another provision of the Act or otherwise.

We reserved ruling on the statutory interpretation issue concerning the timing element in the definition of "owner or operator" and proceeded to trial on the factual question of when the discharge first occurred. We also considered a tardily advanced argument that Quaker State had paid taxes on the subject site through 1985, thereby evidencing some ownership interest at the time of discovery of the spill. Our findings of fact and conclusions of law are contained below:

## FACTS

On July 2, 1985, Commander Patrick of the U.S. Coast Guard took a break from his worries and waded up Pine Creek in the Allegheny National Forest, absorbing the subtle pleasures of a summer day in the woods. As he waded upstream he noticed a silvery sheen on the surface of the water. Closer inspection revealed black deposits on stones in the stream which, when disturbed, generated a rainbow sheen on the water, characteristic of oil contamination.

Oil in streams in Northwestern Pennsylvania is not uncommon, and not always unnatural. Natural seepage from subterranean oil deposits has leaked into these streams for hundreds of years. Indians skimmed oil from the surface of streams for religious and medicinal purposes. The sheen of oil on the water first attracted the embryonic oil industry in the 19th Century and the natural contamination of streams still occurs today.

However, the last century has added manmade sources of stream contamination. Neglected or abandoned wells, pipelines, drilling sites, and waste containment pits have created myriad opportunities for the discharge of oil into Pennsylvania's streams. The occurrence of such discharges in the Allegheny National Forest prompted increased Governmental activity in the area in 1985 and culminated in the creation of an inter-agency task force in August of that year.

As administrator of the Government's clean up fund, Commander Patrick came to the Allegheny National Forest on July 2, 1985. After inspecting several cleanup operations already underway in the area, Commander Patrick began his leisurely walk up Pine Run. Now he followed the silver sheen upstream about 50 yards. There he found an encrusted stripe of semi-solidified oil on the bank of the stream. Clambering up the steep bank he stepped into a clearing.

The Commander stood in a flat, oval meadow. Vegetation grew in clumps and the ground was spongy underfoot. A short distance from the crest of the stream bank he found an area where an oily substance lay on the surface of the ground. Within an hour the EPA and a private contractor, in the area on other cleanups, were on site.

The meadow was in fact the site of a covered, abandoned containment pit. In the production of oil in this region, water is commonly pumped into the underground oil field, forcing the oil and water out of the well heads. The oil and water mixture pumped from the ground is then placed in separation tanks where the oil floats to the surface. The waste water at the bottom of the tank is then drained into a containment pit. A certain amount of oil and sludge drains with the water into the pit. This residue generally is absorbed into the underlying soil and strata.

Some containment pits date back to the 19th Century. The age of the pit involved here is unknown. We do know that the pit existed prior to 1968, and that Quaker State did not use the pit in its operations after that date. Indeed there is no evidence here that Quaker State ever used this pit.

But the pit was located on Lot 128 of Warrant 2244, a site under lease to Quaker State. When the company chose not to renew the lease in 1975, it began abandonment operations, capping and abandoning well sites and removing equipment. At some time in 1977, at the direction and under the supervision of the U.S. Forest Service, the owner of the surface rights, Quaker State covered the pit by bulldozing earth over it, compacting and seeding it. Quaker State completed its abandonment operations early in 1978.

## DISCUSSION

We begin with the Government's assertion, first raised in its cross motion for summary judgment filed two weeks before trial, that local tax records establish Quaker State's ownership interest in the site as late as 1985. Because the discharge was first discovered in 1985, the Government contends that Quaker State is strictly liable as an "owner" under § 1321(f), even under Quaker State's interpretation of the Act.

■ Local tax records identify assessments on the plot known as Warrant 2244. Warrant 2244 is subdivided into various lots which are owned by or are under lease to various parties. The tax records on their face do not differentiate between individual lots and therefore do not reveal whether Quaker State paid taxes on this particular lot in 1985. It is not disputed that Quaker State paid taxes on lots in Warrant 2244, but the company held ownership or leasehold interests in other lots within Warrant 2244 at that time. The

leasehold interest in Lot 128, the site in issue here, expired in 1975.

The burden of proof on ownership is on the Government. The tax records, submitted without explanation of its notations[1] by a knowledgeable official, are merely equivocal. We cannot tell from these records whether Quaker State was paying taxes on Lot 128 or only on other lots it held within the Warrant. A Quaker State official denied that any taxes were paid on Lot 128 after the expiration of the lease. While this ambiguity may be the fault of the records and not the United States, the evidence being equivocal the Government fails to satisfy its burden.

■ Thus we come to the question of the date of initial discharge. While counsel have raised many issues, directly and obliquely, we will confine ourselves to determining whether the initial discharge occurred in 1977 or early 1978 when Quaker State was arguably still in operation on the site, and wells were capped and the pit was filled.

Although Commander Patrick discovered a discharge on July 2, 1985, the Government contends that the spill had in fact begun by April 1978, at the latest. From the evidence presented we conclude that some discharge predated Commander Patrick's discovery. The heavily encrusted condition of the oil on the bank, the overgrowth of vegetation, the semi-solidification of the oils and the absence of any active flow indicate a possible discharge of some vintage.

The Government presented John Reiss, a Government expert in petroleum engineering. Although he has never visited the site because it was excavated and radically altered before his involvement in this case, he has relied on photographs of the site, Commander Patrick's descriptions of the site and discharge, and some statistical data generated by the Government during the cleanup.

---

1. The tax records include the cryptic notation "128/129" under the heading "Property Description." The subject site is on Lot 128. Is this merely coincidence or does the notation identify the lot? The meaning of the notation is not evident from the face of the records, and no explanation of this notation was offered. In any event, the tax assessment on that line item for 1985 was $0.

The Government's theory as explained by the expert is that the containment pit has a limited capacity for water. The covering of the pit and the partial destruction of pit walls in 1977 significantly decreased the capacity of the pit. In periods of heavy rain or snow melt, the pit becomes saturated. Lighter oils in the pit then percolate upward in the soil, eventually bubbling to the surface where water runoff carries the oil over the bank into the stream. Reviewing weather bureau records of rainfall in 1977 and 1978, Mr. Reiss concluded that the initial discharge of oil occurred soon after the covering of the pit, and that such discharges have occurred intermittently thereafter in periods of heavy rainfall or snow melt. The flaw in this opinion is that Mr. Reiss did not know if the pit had a sealed bottom or a permeable bottom which would allow the water to seep into the underlying and adjoining soil and strata.

The simplest and most obvious rejoinder to the Government is the absence of *any* complaints of oil on Pine Run in the eight years between the covering of the pit and the discovery of a discharge. Kinzua Creek, popular among fishermen, is only a mile downstream from the subject site and oil at the confluence with Pine Run would not have been ignored by those environmental watch dogs. Pine Run and the site itself lie within the Allegheny National Forest and a knowledgeable witness testified that U.S. Forest Service personnel periodically inspect streams and oil drilling operations. In fact, the Forest Service owns the surface rights to the subject site and gave the order to cover the containment pit and supervised the operation. It should also be noted that the site is not remote. A Forest Service road follows the course of the creek and borders the meadow. Finally, an employee of an oil pipeline company that maintains a line bordering the creek and passing through the area of the pit testified that he waded up Pine Run in 1983, for the express purpose of detecting any oil discharge into Pine Run, and found nothing.[2] There has been some reference to

Pine Run as a state stocked trout stream, which of course would subject it to closer and more frequent inspection from fishermen and state authorities, but no evidence was presented on this point.

We have also heard reference to a fisherman's complaint of oil on Pine run, made at or near the time of Commander Patrick's discovery. The Commander was unaware of this complaint when he waded up Pine Run on July 2, 1985, and he didn't learn of it until several days later. But this citizen's complaint further buttresses our conclusion that if there had been numerous prior discharges over a period of eight years, someone would have noticed them. The Government argues that the intermittent nature of these discharges and their occurrence during periods of heavy runoff make them unlikely to be discovered by most observers. However, the work of Forest Service personnel is not limited to good weather. Furthermore, evidence of a discharge lingers after the runoff. Commander Patrick's discovery occurred on a beautiful summer day and he noted the tell-tale sheen on the water and oil residue on the rocks in the stream. It is certainly possible that some of these intermittent discharges would have gone undetected, but we cannot accept the Government's argument that *all* of them, for eight years, went entirely unnoticed.

We also conclude that the expert's estimation of the date of initial discharge is without sufficient factual basis. Mr. Riess could only estimate the capacity of the pit based on minimal factual information. He lacked specifics concerning geology and hydrology of the site as well as other factors. While we believe the expert may fairly state an opinion on the manner in which the discharge occurred at this site, we do not believe the underlying facts permit an accurate estimation of such events eight years prior to their discovery.

For the reasons stated above, we conclude that 1.) the Government failed to establish that Quaker State was an "own-

**2.** The witness could not be certain that he walked upstream as far as the subject site, but he set out from Kinzua Creek only a mile down-

stream and walked a considerable distance. Of course any discharge would have flowed downstream toward him.

er" of Lot 128 in 1985, the tax records being equivocal at best, and 2.) that the initial discharge from the site did not occur in 1977 or 1978 when Quaker State was still in occupation on the site. As a result, Quaker State is not an "owner or operator" under either proferred construction of that term, and cannot be liable under 33 U.S.C. § 1321(f).

We have also considered the statutory construction issue raised by Quaker State's Motion for Summary Judgment. As described above, Quaker State contends that "owner or operator" is defined as of the date of discovery of a spill, while the Government argues that the date of initial discharge, even if years in the past, is the pertinent time element.

■ Although there are no reported decisions on this issue, perhaps because discharge and discovery are usually contemporaneous, our review of the Act and its purpose compel the conclusion that Congress intended to hold strictly liable the "owner or operator" at the time a discharge is discovered.

First of all, the Act defines owner or operator in the present tense with the single exception of abandoned offshore facilities. 33 U.S.C. § 1321(a)(6). In that situation, because there may not be a present owner or operator, the Act holds strictly liable the last owner or operator prior to abandonment. An abandoned onshore facility does not present the same problem—there is always a readily identifiable property owner who may be held strictly liable.

The definition is stated in the present tense because Congress sought to encourage the immediate cleanup of spills. When a spill is discovered, response must be swift. If the Government must bear the cost of cleanup, there must be a ready pocket for reimbursement. It is the owner or operator at the time the spill is first discovered who has control of the site and the source of discharge. He is readily identifiable. He is most likely to be in position to halt the discharge, to effect an immediate cleanup, or to prevent a discharge in the first place. If the onus of cleanup falls on the Government, he is the clearest and most expeditious source for reimbursement.

On the other hand, if the Government must search in the past for the date of initial discharge and the identity of some past owner or operator, the purpose of the Act is thwarted. Determining the date of initial discharge may require extensive investigation and expert opinion. It will almost certainly be the subject of litigation. Identifying the past owner or operator may also require considerable effort and be fraught with uncertainty. In any event that owner or operator may no longer be in control of the site, or may not longer exist. Congress' desire for immediate cleanup or in the alternative for a ready source for reimbursement would certainly be frustrated by the definition advanced by the Government.

We conclude therefore that "owner or operator" is to be defined as of the date of discovery of a spill and not at some date in the past. We recognize that in the present case there was no "operator" in 1985 and the "owner" at the time of discovery of the spill was the U.S. Forest Service. Therefore, the Government itself would be the strictly liable party under § 1321(f). Though the fact setting in the present case yields a bad result for the Government on the strict liability provisions, we will not torture the Act to achieve a result not intended by Congress.

### Petition to Amend Counterclaim

■ The Government's original counterclaim premised liability solely on 33 U.S.C. § 1321(f), the strict liability imposed on an "owner or operator". The Government subsequently sought leave to amend to assert an alternative ground for liability under 33 U.S.C. § 1321(g), entitled "Third Party Liability". Quaker State has opposed the Motion, arguing that § 1321(g) and the Act as a whole do not permit the Government to sue a "third party" without first suing the applicable "owner or operator". Section 1321(g) reads in pertinent part:

> In any case where an owner or operator ... of an onshore facility, ... from which oil or a hazardous substance is

discharged in violation of subsection (b)(3) of this section, proves that such discharge of oil solely by an act or omission of a third party, or was caused solely by such an act or omission in combination with an act of God, an act of war, or negligence on the part of the United States Government, such third party shall ... be liable to the United States Government for the actual costs incurred ... for removal of such oil or substance ...

This provision makes clear Congress' intention that the Government look first to the "owner or operator" for any reimbursement of cleanup costs. Being strictly liable and on site with the power to prevent or clean up discharges, the owner or operator is the Government's clearest and most expeditious target.

Quaker State argues that the Act goes further, prohibiting the Government from filing suit against a culpable negligent party without first suing the "owner or operator". Under Quaker State's interpretation the Government would have to file suit against the owner or operator, and that owner or operator would then have to "prove" that a third party's negligence was the sole cause of the discharge. Only then could the Government sue the culpable third party.

We do not read the statute as mandating such an awkward and perilous procedure. In this we agree with the reasoning of the Court in *United States v. Redwood City,* 640 F.2d 963 (9th Cir.1981) which addressed the issue in a closely related procedural setting:

"We do not find that 33 USC § 1321 established a priority procedure which must be followed by the United States in filing suit against a party. In many cases the construction favored by the appellees would require a senseless expenditure of time and resources by requiring the United States to sue the non-culpable owner/operator with such owner/operator, cooperatively, bringing suit against the culpable third party. We refuse to add our imprimatur to such an impediment to the Congressionally declared purpose of prevention of oil spills. 640 F.2d at 969. We also note, as did the 9th Circuit, that § 1321(g) specifically provides that;

The United States may bring an action against the third party in any court of competent jurisdiction to recover such removal costs.

The present case is an excellent example of the absurd and inequitable results possible under Quaker State's construction of the Act. Here, the only apparent "owner or operator" would be the U.S. Forest Service which has at all times pertinent owned the surface rights to the subject lot.[3] Adopting Quaker State's construction, the Coast Guard would be required to sue the Forest Service as a predicate to suing Quaker State. Clearly the creation of an anomaly, the United States being required to sue itself, should not excuse a potentially culpable party from liability under the Act. For these reasons we conclude that the Government may sue Quaker State directly under 33 U.S.C. § 1321(g).

Quaker State also opposes the amendment because it asserts that the Government cannot establish that Quaker State was the sole cause of the discharge. This is clearly a factual issue which we cannot resolve at this stage.

Quaker State also charges the Government with undue delay and bad faith in tardily amending the counterclaim. We see no prejudice to Quaker State as a result of the delay and while we do not believe the Government has been prompt in these matters we cannot conclude that the delay was excessive or undue.

## CONCLUSION

For the reasons stated above, we will dismiss Count I of the Government's counterclaim and grant Quaker State declaratory judgment on the owner or operator is-

---

**3.** Witco Chemical Co. apparently owns the subsurface oil and gas rights at the subject site. Because the allegedly offending pit is manmade and at or near the surface, Witco would not be a culpable "owner" under § 1321(f).

sue. Also, we will grant the Government leave to amend its counterclaim to assert a direct cause of action under 33 U.S.C. § 1321(g). An appropriate order will be entered.